WASHINGTON NATIONAL INSURANCE COMPANY *v.*
COMMISSIONER OF INSURANCE, HARVEY G. COMBS.

5-1048                                    294 S. W. 2d 486

Opinion delivered October 29, 1956.

*Burton P. Sears* and *Rose, Meek, House, Barron &
Nash,* for appellant.

*Perry V. Whitmore,* for appellee.

864

PAUL WARD, Associate Justice. This controversy arises out of a complaint made by Mr. John Greene, a life insurance agent, to Harvey G. Combs, State Insurance Commissioner, charging the Washington National Insurance Company with unfair trade practices in that said Company had violated certain provisions of Ark. Stats. § 66-1701 to § 66-1713. As provided in the said statutes, the Commissioner heard testimony by both sides and ruled that the Washington National Insurance Company (hereinafter sometimes referred to as the Company) was guilty of acts amounting to unfair trade practices, and ordered it to cease and desist from engaging in such acts. This cause is now on appeal from the Chancery Court of Pulaski County which sustained the Commissioner's findings.

*Factual Background.* For a better comprehension of the issue here involved we set forth below the events and circumstances leading up to the filing of the charges above mentioned, including therein only such facts as are uncontroverted.

John Greene is an insurance agent and for something like 25 or 30 years he has been so engaged, during which time he has represented different companies. In 1948 he learned that Dr. George S. Benson, President of Harding College at Searcy, was starting a drive to raise $1,000,000 for the support of his college, and Greene, who was an agent for the Washington National Insurance Company at the time, persuaded Dr. Benson and his college board to take out a term insurance policy in the amount of $1,000,000. For writing this business Greene received a commission of $6,781.41. It is shown that in 1937 one of the general officers of the company had made a donation to Harding College and that he and other officers had consistently contributed liberal amounts to the college in the years that followed. Sometime after this policy was issued Greene became dissatisfied with the commission which he received from the Company and, motivated by this dissatisfaction perhaps or if not then for other reasons, had a falling out with the Company, resulting in a severance of relationships. Following this, some two or three years later,

Greene filed a complaint against the company before the Insurance Commissioner and asked that their license be revoked. The Company's license was not revoked and Greene states that he asked the Commissioner not to do so, but he also states that he recognizes that just making the charges is one of the worst things that could happen to an insurance company.

In the early part of 1955 Greene learned that Dr. Benson was fixing to start another campaign to raise $2,000,000 for the college. He called on Dr. Benson and asked to write him an insurance policy for $1,000,000. Dr. Benson was agreeable to the idea but stated that he desired the Washington National Insurance Company to be given the business. Greene explained that he had made inquiry of Mr. Roy Reagan, local general agent for the Company, and of Harvey G. Combs, the Insurance Commissioner, and that he had learned that the company could not write the policy in question, principally for the reason that Benson was 56 years old, or one year over the limit. At Dr. Benson's suggestion Greene contacted Dr. L. M. Graves in Memphis and Mr. C. L. Ganus in New Orleans (President and Past President of the Board of Trustees). In each instance Graves and Ganus were agreeable to the idea but each of them expressed the desire that if possible the business should be given to the Company. In each instance it was explained by Greene that the Company could not write the policy. After Greene had obtained an application blank signed by Benson for the insurance policy and after he had received checks from Benson for the premium, it was learned by Dr. Benson that the Company was able and willing to write the policy. Thereupon it was agreed by Benson, Graves and Ganus that the application and checks given Greene should be cancelled and the policy given to the Company, and Greene was notified to this effect.

*The Statutes.* Section 66-1703 states that no insurance company shall engage in any trade practices which is defined by the Act to be "an unfair method of competition or an unfair or deceptive act or practice . . ." The following section defines 8 different classifications

of "unfair methods of competition and unfair and deceptive acts." Although, as hereafter shown, the complaint against the Company in this instance makes no definite charge by reference to the statute it is assumed that such was the intention. Sub-section 4 refers to coercion or intimidation tending to result in unusual restraint or, a monopoly in, the insurance business; Sub-section 7 forbids discrimination between individuals of the same class and expectation of life in the rates charged and in the general provisions of the policy, and; Sub-section 8 prohibits the rebate of premiums. Section 66-1707 provides that if the Commissioner finds that any insurance company has violated any provisions of the act he shall order it to cease and desist from so doing. The act also provides that the findings of the Commissioner shall be sustained if they are supported by substantial evidence.

*The Commissioner's Findings.* The findings of the Commissioner, consisting of 8 pages in the record, discuss at great length certain phases of the testimony which, in our opinion has no direct bearing on the guilt or innocence of the Company. It concludes with ordering the Company to "cease and desist from engaging in such methods of competition, acts, and practices as was resorted to in procuring the policy . . ." in question. It does not specify what section of the statute the Company is supposed to have violated. However after a careful reading of the Commissioner's findings we have concluded that the Company is charged with engaging in unfair trade practices for the following reasons and in the following particulars: (a) The Company was guilty of "unfair treatment to agents and unfair dealings between (insurance) companies"; (b) The Company is "guilty of committing an act of coercion or intimidation in this case"; (c) The Company offered to give the agent's commission to Harding College, and; (d) The Company was not qualified to write the policy in question.

In our opinion there is no substantial evidence to show that the Company was guilty of any of the charges mentioned above. In fact it seems to us that it was

apparent to the Commissioner that the testimony was not entirely satisfactory. In one instance the Commissioner in discussing the amount of commission the Company allowed its agent in this case, stated: ''I feel that the above evidence is sufficient to convince any one that something took place along the line that has not been fully disclosed.'' Again, in reference to the charges as a whole, the Commissioner stated: ''I am convinced that an inducement and a consideration within the meaning of Section 66-1704, Ark. Stats. 1947, entered into Washington's issue of the 1955 policy which has not been fully disclosed . . .''

(a) It is not clear to us just what the Commissioner had in mind with reference to unfair treatment to agents. In this connection he stated: ''The very life and existence of the insurance business depends upon fair treatment to agents and their dealings between companies. I cannot place my stamp of approval upon the Company's actions in this matter. To the contrary I consider such actions as unfair and deceptive and unlawful.'' If the reference is to the fact that the Company's general agent, Roy Reagan, received only $600 commission for writing the policy in question, we cannot see where that has any bearing on the question of unfair trade practices, and it surely does not adversely affect policyholders. Certainly it was of no concern to Greene or Benson. Reagan was not a writing agent, and the undisputed testimony is that he did practically nothing to secure the business and that the $600 was satisfactory to him. If the reference is to the unfair treatment accorded Greene by the Company, then we can find no evidence to support the charge. If Benson in any way misled or mistreated Greene that would be a matter of concern to them only. The undisputed evidence in this case shows that Greene well knew he did not and could not represent the Company, and the Company was in no way obligated to him at any stage of the proceedings. The testimony fully discloses that there can be no question about this fact.

(b) Coercion. We can find absolutely nothing in the testimony to substantiate the charge that the Com-

pany coerced Benson or the Board of Trustees of Harding College to take out the insurance policy in question. Again the testimony is undisputed that the Company had written Benson in 1948; officers of the Company had in years past made liberal donations to Harding College; The Company did nothing to induce Benson to take out this policy; Dr. Benson, Dr. Graves and Mr. Ganus all stated that they wanted the Company to have the business, and this is verified by Greene, and; The business was handed to the Company without any solicitation or effort on its part.

(c) It is charged that the company (presumably in violation of sub-section 8 of Section 66-1704 of the Ark. Stats.), in order to secure this business gave or promised to give the commission (presumably payable to an authorized writing agent) to Harding College. The only testimony that in any way substantiates this charge is Greene's statement that Benson said that the Company said it would give the commission to the college. It is disclosed that this statement by Benson was made in connection with a telephone call which Dr. Benson made after the policy had already been given to the Company in an effort to accommodate Greene. Either at Greene's request or upon Dr. Benson's own initiative he called an official of the Company in Chicago and asked him if he would be willing to give the commission to Greene. The official's reply over the phone was to the effect that he wanted nothing to do with Greene and, furthermore, that if he was going to give the commission to anybody he would prefer to give it to Harding College. Dr. Benson and all of the officials of the Company that testified state positively that no commission was given to Harding College as a result of this policy being written. All the facts and circumstances discredit the implication of the hearsay testimony given by Greene. At the time the question of commission was raised the Company had already been given the policy: The Company was under no obligations to Benson or the college, but, on the other hand Benson was under obligations to the Company for past donations; there is absolutely no evidence in the record that the college did in fact receive the commission—

all the evidence being just to the contrary, and; why, if the Company had already given the commission to the college, would Benson have asked that it be given to Greene?

(d) As we read the record it is abundantly clear that the Company was qualified to write the policy in question and that it violated no provision of the statute in doing so. Although the Company's rate book on file with the Insurance Commissioner did not contain the description of the policy of this kind for a person 56 years old (one year older than shown in the rate book), the uncontradicted testimony shows clearly that this Company and many other companies have the right, and make it a practice, to deviate in some respects from the rate book in special cases such as the one presented here. Mr. Mullins, Vice President of Washington National Insurance Company, stated that it was common practice among all insurance companies, in unusual instances, to change or modify standardized policies so long as they adhered to the rate which had been filed; that his company is consistently issuing policies that are over the specified limits both as to ages and amounts; that this is pretty much standard practice; that 95 per cent of the 800 life insurance companies operating in the United States will occasionally, and many of them quite frequently, make exceptions to their published underwriting practices. He also stated that insurance companies had the right to make certain changes without notice. Mr. Greene himself acknowledges that the rate book of one of his own companies — The New York Life — contains this clause: ''Company's premium rates, policy values, underwriting limitations and rules are subject to change without notice with respect to policies issued thereunder.''

It seems clear to us that the premium charged by the company in this case was based on the schedule of rates which it had in force at the time. The Company's schedule, shown in the record and a part of the policy in question, shows a schedule of rates from age 20 to 69. According to this schedule the premium for $1,000 for a

person 56 years of age is $23.64. From this it follows that the premium on a policy for $1,000,000 would be $23,640 which is the amount charged in this instance by the Company.

As indicated above the statutes in question define 8 separate and distinct classifications of unfair practices. Also we have stated that the alleged charges preferred against the Company in this instance were somewhat general and not definitely classified according to the statute, but we have discussed them above as being so classified. Section 66-1709 deals with unfair practices and unfair methods of competition which are not defined in the statute. We see no occasion for discussing the charges under this classification. If however the charges were considered under the latter classification it would require more evidence to sustain them as provided by paragraph (d) where it is stated that the Commissioner's findings must be supported by the weight of the evidence.

In our consideration of this case we recognize the duty and responsibility of the Insurance Commissioner to protect the general public against unfair practices by Insurance companies, and that he was merely trying to discharge that duty in this case. On the other hand we are forced to recognize that the charge against the Company in this case is a serious one and should not be sustained on suspicion or innuendoes but should be supported by substantial evidence. Mr. Greene, a man of vast insurance experience, admits that there is nothing more damaging to an insurance company's reputation or standing than to have a complaint lodged against it with the Insurance Commissioner. We recognize that Mr. Greene demonstrated ingenuity and expended considerable time and effort in attempting to write this insurance policy in the companies which he represented, and that he received no remuneration therefor, but this constitutes no lawful reason for punishing the Washington National Insurance Company. In our view it is immaterial that Mr. Greene was sincere in representing to Dr. Benson and the members of the Board of Trustees that

the Washington National Insurance Company could not legally write the policy they desired. We can understand why he thought the whole matter should be brought to the attention of the Insurance Commissioner for a full investigation, and we have no inclination to criticize him for doing so. On the other hand charges and investigations alone do not convict.

Reversed and dismissed.

Justice McFADDIN disqualified and not participating. Justice GEORGE ROSE SMITH not participating.

Justice MILLWEE (dissenting). I would affirm the findings and orders of the Insurance Commissioner and the Chancellor. In reversing their actions the majority conclude there was no evidence to support the charges filed. This is not surprising since they accept the testimony of the Company's officers and other witnesses as "uncontroverted," and "discredit" the evidence offered by John H. Greene as "hearsay" and supported only by "suspicion or innuendoes".

Despite the lopsided view of the testimony by the majority, a few facts are crystal clear. Even the majority concede that Mr. Greene expended much money, time and effort in negotiating with the College for the policy in question. The representation by Mr. Greene that the Company did not write the type policy desired by the College was made after the most painstaking inquiry and research and in perfect good faith. Not only did he check the Company's rate books including its current filings with the Insurance Department but he verified such information by checking the leading insurance manuals. In addition, and to be certain, he made the same inquiry of the Company's general agent at Little Rock and the latter admitted that he told Mr. Greene that the Company did not issue the policy.

But: Who wound up with the agent's fee or commission for writing the policy finally issued and that Mr. Greene worked so hard and diligently to earn? The very same general agent who had led Mr. Greene to believe that the Company did not write the policy, and

who, in reference to the commission, frankly stated: "I had done nothing to earn it." It is true that the fee paid was much less than a normal commission but Mr. Greene had every right to believe the Company donated the balance of a normal commission to the College just as the agent, Ferguson, indicated it would. Like the Commissioner, I consider such actions on the part of the Company, "Unfair, deceptive and unlawful," under our statute. For such actions the Company has been neither convicted nor penalized but is only mildly reprimanded and warned to cease and desist. Instead of repudiating the efforts of Mr. Greene, the Commissioner and the Chancellor to keep the life insurance business in this state clean, this court should be anxious and ready to uphold them. I, therefore, respectfully dissent.